| |
|---|
| **Petrova v Ilnitskyy** |
| 2024 NY Slip Op 34563(U) |
| December 29, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 3019/16 |
| Judge: Genine D. Edwards |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Term, Part 80, of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 29th day of December 2024.

P R E S E N T:

HON. GENINE D. EDWARDS,
                              Justice.
-------------------------------------------------------------------x

SOFIYA PETROVA, as Administrator of the Goods, Chattels and Credits, which were of GENYA KATS, deceased,

                                        Plaintiff,

                    -against-

FEDIR ILNITSKYY, M.D.,
NEW YORK METHODIST HOSPITAL,
ALBERT KHASKI, M.D.,
MU-I K, KUO, M.D.,
OLGA PAVLOVA, R.N.,
MAGDI ANIS BEBAWI, M.D.,
HAYM SALOMON HOME FOR NURSING AND REHABILITATION,
and NEW YORK PRESBYTERIAN HEALTH CARE SYSTEM,

                                        Defendants.
-------------------------------------------------------------------x[1]

**DECISION AND ORDER**

Index No. 3019/16 (converted to e-filing)

Mot. Seq. 16, 15, and 18

The following e-filed papers read herein:                    NYSCEF Doc Nos.:

Notice of Motion/Cross Motion, Affidavits (Affirmations)
 and Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   133-155; 156-176; 213-215
Affirmations (Affidavits) in Opposition and Exhibits . . . . . . . . . .   186-189; 194-196; 200-207; 208-212
Reply Affirmations and Exhibits . . . . . . . . . . . . . . . . . . . . . . . .   223; 224

In this action to recover damages for negligence/medical malpractice and violation of

the Public Health Law, (1) defendants Fedir Ilnitskyy, M.D., and New York Methodist Hospital

("Methodist" and collectively with Fedir Ilnitskyy, M.D., the "Methodist defendants") jointly;

_____

[1] The caption conforms to its latest version as set forth in this Court's order, dated June 28, 2024. Defendants Olga Pavlova, R.N., and New York Presbyterian Health Care System never appeared in this action. *See* Methodist defendants' counsel's affirmation in support, dated March 25, 2024, ¶ 10.

[* 1]

(2) defendant Mu-I K. Kuo, M.D. ("Dr. Kuo"), individually; and (3) defendant Haym Salomon Home for Nursing and Rehabilitation ("HSH") individually; each moved (or cross-moved, as applicable) for summary judgment dismissing all claims as against the Methodist defendants and Dr. Kuo, and in the instance of HSH, dismissing all vicarious claims as against it stemming from Dr. Kuo's alleged acts/omissions. Plaintiff Sofiya Petrova, as the administrator of the Estate of her late mother, Genya Kats ("plaintiff") as well as non-moving defendant Albert Khaski, M.D. ("Dr. Khaski") separately objected to all three motions.

## Background

On January 6, 2015, plaintiff's decedent Genya Kats (the "patient") passed away at the age of 91 at a nonparty nursing home from "metastatic adenocarcinoma of the pancreas," with other significant conditions of the "diffuse Lewy body disease,"[2] "atherosclerotic cardiovascular disease," and "diabetes mellites."[3] Approximately seven months prior, on May 13, 2014,[4] the patient (then living at her own home) presented to Methodist's emergency room ("ER") with generalized jaundice of two weeks' duration, with the associated (and progressively worsening) pruritis, nausea, and vomiting.[5] The patient's major comorbidities, at the time, included: (1) hypertension; (2) left bundle branch block (a cardiac conduction abnormality); (3) hyperlipidemia; (4) diabetes mellitus; (5) chronic kidney disease; and

---

[2] "Diffuse Lewy body disease" is defined as "a degenerative cerebral disorder of the elderly, characterized initially by progressive dementia or psychosis, and subsequently by parkinsonian findings, usually with severe rigidity; other manifestations include involuntary movements, myoclonus, dysphagia, and orthostatic hypotension." Stedman's Medical Dictionary, Entry No. 254230 (online edition).

[3] Office of Chief Medical Examiner's Report of Autopsy of the Patient's Body, dated January 7, 2015, page 2. When quoting from the medical record, the Court spelled out abbreviations and corrected typographical errors.

[4] All references are to calendar year 2014, unless otherwise indicated.

[5] Methodist's records, page 48 of 690.

2

[* 2]

(6) monoclonal gammopathy of undetermined significance (a potential precursor to multiple myeloma, a form of a plasma-cell malignancy).[6]

A work-up at the ER revealed an obstructing pancreatic mass which (on cytology) was confirmed as a Stage IV pancreatic adenocarcinoma. A biliary drain was placed as a palliative measure. Considering the patient's deconditioned state and her multiple comorbidities, she was not a candidate for surgery, chemotherapy, or any other cancer-directed therapy to reduce the burden of her disease or to prolong her survival. In the ensuing months, the patient's oncologists confirmed that her pancreatic carcinoma was not only incurable but also was further metastasizing. The oncologists advised that the patient's only choice, given her "active dying" status, was general palliative care.

As relevant to this action, the patient was hospitalized at Methodist from September 6th to September 15th, with altered mental status, sepsis, aspiration pneumonia, and a possible biliary tract infection that was accompanied by pancreatitis (the "initial Methodist hospitalization"). During that hospitalization, the patient was suffering from one sacral pressure ulcer and from a right heel pressure ulcer (collectively, "PUs"). After treatment with antibiotics and fluids, the patient was discharged from Methodist to HSH on September 15th. The ulcers were evaluated by the wound care service and were treated by regular cleaning and application of topical pharmacotherapies.

The patient resided at HSH from September 15th to November 23rd, with some interruptions for in-hospital treatments. On admission to HSH on September 15th, the patient was suffering from a sacral PU and from bilateral heel PUs (a progression from her right heel-

---

[6] Methodist's records, page 48 of 690.

3

only PU at Methodist). During her residence at HSH, the patient's PUs were treated with various topical therapies (including hydrogel, Dakin's solution, and calcium alginate dressings) and with repositioning/offloading (including regular turning and repositioning as well as heel offloading). In the course of her residence at HSH, the patient was seen multiple times by its wound-care physician, Dr. Kuo. Approximately three weeks into the patient's admission at HSH, on October 5th, Dr. Kuo recommended that the patient's sacral PU be debrided by a general surgeon.

On October 14th, the patient was re-hospitalized at Methodist for three days until October 17th (the "subsequent Methodist hospitalization"). At the inception of her subsequent hospitalization, the patient required a transfusion of packed red blood cells for her anemia. She was also administered intravenous antibiotics for her urinary tract infection and foot ulcer. At discharge, she was prescribed a course of antibiotics. As relevant herein, the patient's sacral PU was treated with the TheraHoney wound dressing, whereas her left-heel PU was surgically debrided. Once the patient's condition was sufficiently stabilized, she returned to HSH where, upon admission, she was noted to have been suffering from the sacral and left-heel PUs.

As noted, the patient succumbed to her metastasizing cancer at a nonparty nursing home on January 5, 2015. Thirteen months later, on March 16, 2016, plaintiff (as the administrator of the patient's estate) brought the instant action against the Methodist defendants as well as against (among others) Dr. Kuo and HSH. After discovery was completed and a note of issue was filed, the instant motions/cross-motion were timely served. On August 18, 2024, the three motions/cross-motion were submitted. Additional facts are noted when relevant to the discussion below.

4

[* 4]

### Standard of Review

"A defendant moving for summary judgment . . . must demonstrate the absence of any material issues of fact with respect to at least one of the [two] elements of a cause of action alleging medical malpractice: (1) whether the physician deviated or departed from accepted community standards of practice, or (2) that such a departure was a proximate cause of the plaintiff's injuries." *Rosenthal v. Alexander*, 180 A.D.3d 826, 118 N.Y.S.3d 658 (2d Dept. 2020) (internal citation omitted). "When a defendant in a medical malpractice action demonstrates the absence of any material issues of fact with respect to at least one of [the two] elements, summary judgment dismissing the action should eventuate unless the plaintiff raises a triable issue of fact in opposition." *Schwartz v. Partridge*, 179 A.D.3d 963, 117 N.Y.S.3d 300 (2d Dept. 2020) (internal citations omitted). "A physician's [expert affirmation] in opposition to a motion for summary judgment must attest to the defendant's departure from accepted practice, which departure was a competent producing cause of the injury." *Shahid v. New York City Health & Hosps. Corp.*, 47 A.D.3d 800, 850 N.Y.S.2d 519 (2d Dept. 2008). "General and conclusory allegations unsupported by competent evidence are insufficient to defeat a motion for summary judgment." *Id.*

With regard to plaintiff's additional cause of action premised on an alleged violation of Public Health Law § 2801-d, liability under this statute "contemplates injury to the patient caused by the deprivation of a right conferred by contract, statute, regulation, code or rule, subject to the defense that the facility exercised all care reasonably necessary to prevent and limit the deprivation and injury to the patient." *Van DeVeerdonk v. North Westchester Restorative Therapy & Nursing Ctr.*, 223 A.D.3d 702, 204 N.Y.S.3d 132 (2d Dept. 2024) (internal quotation marks omitted). "[A] defendant moving for summary judgment dismissing a

5

[* 5]

cause of action alleging deprivation of rights pursuant to Public Health Law § 2801-d meets its prima facie burden by submitting evidence that the plaintiff's injuries did not arise through any action or negligence of its employees." *Russell v. River Manor Corp.*, 216 A.D.3d 827, 188 N.Y.S.3d 191 (2d Dept. 2023).

## Discussion

### Methodist Defendants

In support of their motion, the Methodist defendants submitted (among other documents) the affirmation of Howard J. Guzik, M.D. ("Dr. Guzik"), a board-certified internist with board sub-certifications in geriatrics and palliative care. In his affirmation, Dr. Guzik addressed and discussed in detail the patient's poor prognosis from her terminal cancer and its associated consequences, including the unavoidable development and persistence of her PUs. In that regard, Dr. Guzik explained (in ¶ 17 of his affirmation) that:

> "[B]y the time of the [initial Methodist hospitalization in] September 2014 . . . , [the patient] was a terminal cancer patient for whom palliative and hospice services were appropriately indicated. The 2014 [National Pressure Ulcer Advisory Panel] guidelines outline[ ] general principles that should guide pressure ulcer management in individuals receiving palliative care: 'Palliative care is focused on preventing and relieving suffering of the individual with life-threatening illness and his or her significant others through identification, assessment, and relief of distressing physical, psychosocial and spiritual issues, and pain. while neither hastening nor prolonging death. Palliative pressure ulcer care is not 'lack of care,' but care focused on comfort and limiting the extent or impact of the wound. Prevention of new pressure ulcers remains important; however, during the period of active dying, comfort and/or the individual's preference may override implementation of active prevention strategies.' However, despite these proper and indicated treatment recommendations, hospice was refused/declined by the [patient's] family. . ." (footnote omitted).

More importantly, Dr. Guzik emphasized that plaintiff missed the big picture, which was that "the presenting patient for this case was a terminal cancer patient of advanced age who was going through the dying process and who likewise suffered from other chronic medical

6

[* 6]

conditions that predisposed her to developing pressure ulcers [in the course of both her initial and subsequent Methodist hospitalizations]." In Dr. Guzik's opinion the patient's family's insistence for "curative treatment" (reinforced by her family's concurrent refusal of hospice care) was "unrealistic" because the patient's PUs (as well as other stigmata of her body's deterioration) were "part of the dying process, which could not be stopped." Dr. Guzik's conclusion in that regard was corroborated by the deposition testimony of Dr. Kuo that "when you have a patient who's had pancreatic cancer[,] with advanced age[,] with anemia, with uncontrolled diabetes, with low albumin, with a failure to thrive . . . *[, her] healing is set up for failure . . . because [her] comorbidities . . . [are] holding her back from healing*" (emphasis added).

Dr. Kuo/HSH

In support of her motion (and in support of HSH's related cross-motion as to vicarious liability), Dr. Kuo proffered the affirmation of Alisha Oropallo, M.D. ("Dr. Oropallo"), a board-certified general and vascular surgeon. Dr. Oropallo opined that Dr. Kuo's care and treatment of the patient's PUs conformed with good and accepted standards of medico-surgical practice. Dr. Oropallo further opined that the "myriad" of the patient's comorbidities "not only placed her at a heightened risk for the development of pressure ulcers, but also diminished her ability to heal from [them]." Dr. Oropallo noted that as if the aforementioned comorbidities were not enough, the patient was also suffering from a "tortuous and calcified aorta" which reduced blood flow through her heart, and which "significantly inhibit[ed] [her] body's ability to heal wounds." Dr. Oropallo concluded that "[t]he development and sustaining of pressure ulcers can, and do occur, as did here, in the absence of negligence." and that Dr. Kuo's care and treatment of the patient "did not in any way cause or contribute to [her] alleged injuries."

7

At a minimum, the Methodist defendants and Dr. Kuo/HSH each met their respective prima facie burden as to the proximate cause element of plaintiff's claims to be entitled to summary judgment. *See Avgi v. Policha,* ___ A.D.3d ___, ___ N.Y.S.3d ___, 2024 N.Y. Slip Op. 05951 (2d Dept. 2024); *Mattocks v. Ellant,* 231 A.D.3d 813, 219 N.Y.S.3d 715 (2d Dept. 2024); *Campbell v. Ditmas Park Rehabilitation & Care Ctr., LLC,* 225 A.D.3d 835, 208 N.Y.S.3d 220 (2d Dept. 2024); *Nisevich v. Shorefront Ctr. for Rehabilitation & Nursing Care,* 216 A.D.3d 981, 188 N.Y.S.3d 684 (2d Dept. 2023); *Russell v. River Manor Corp.,* 216 A.D.3d 827, 188 N.Y.S.3d 191 (2d Dept. 2023).

Plaintiff's Opposition

In opposition to both motions (as well as in opposition to HSH's cross-motion), plaintiff proffered an affirmation of a board-certified internist ("plaintiff's expert"). In essence, plaintiff's expert opined that the Methodist defendants and Dr. Kuo (individually or in combination) failed to: (1) "properly assess and document" the patient's PUs; (2) update her care plan; (3) call all necessary and proper wound consultations; and (4) notify the relevant healthcare providers of the worsening status of the patient's PUs. On the subject of proximate cause, plaintiff's expert opined in a convoluted fashion that "[j]ust because the [patient's] family had decided not [to have her] . . . undergo treatment for her pancreatic adenocarcinoma in approximately May 2014, the remaining months of her life were severely compromised due to the significant [and poorly treated PUs] and accompanying pain."

Plaintiff's expert's affirmation was conclusory and speculative, failed to address the impact of the patient's advanced (and advancing) pancreatic cancer in the context of her multiple comorbidities, and was lacking on the essential element of proximate cause. *See Mattocks v. Ellant,* 231 A.D.3d 813, 219 N.Y.S.3d 715; *Campbell v. Ditmas Park*

8

[* 8]

*Rehabilitation & Care Ctr., LLC*, 225 A.D.3d 835, 208 N.Y.S.3d 220; *Barnaman v. Bishop Hucles Episcopal Nursing Home*, 213 A.D.3d 896, 184 N.Y.S.3d 800 (2d Dept. 2023); *Lowe v. Japal*, 170 A.D.3d 701, 95 N.Y.S.3d 363 (2d Dept. 2019); *Novick v. South Nassau Communities Hosp.*, 136 A.D.3d 999, 26 N.Y.S.3d 182 (2d Dept. 2016).

It is well established that on the element of "causation, the plaintiff's evidence may be deemed legally sufficient even if its expert cannot quantify the extent to which the defendant's act or omission decreased the plaintiff's chance of a better outcome or increased his injury, as long as evidence is presented from which the jury may infer that the defendant's conduct diminished the plaintiff's chance of a better outcome or increased his injury." *Starre v. Dean*, 229 A.D.3d 728, 215 N.Y.S.3d 490 (2d Dept. 2024) (italics and internal quotation marks omitted). Assuming the truth of plaintiff's expert's position that "the remaining months of [the patient's] life were severely compromised due to [her] significant [PUs] and accompanying pain," plaintiff failed to raise a triable issue of fact that "a reasonable person might conclude that it was more probable than not that the defendant's departure was a substantial factor in causing the plaintiff's injury." *Whitehall v. Andrade*. 231 A.D.3d 1094, 231 A.D.3d 1094, 220 N.Y.S.3d 145 (2d Dept. 2024) (internal quotation marks omitted). More fundamentally, "[a] finding of liability is not appropriate where [as is the instance here], to establish a connection between a defendant's alleged departures and the plaintiff's injuries, the jury could only rely on speculation." *Whitehall v. Andrade*, 231 A.D.3d 1094, 220 N.Y.S.3d 145.

As stated, the patient was of failing health and was suffering from the synergistic effects of her multiple: (1) chronic medical conditions (e.g., diffuse atherosclerosis, diabetes mellitus

9

[* 9]

Parkinson's disease, and "plasma cell dyscrasia"[7]); and (2) acute medical conditions (e.g., metastatic pancreatic cancer, pancreatic insufficiency, urinary tract infections, and malnutrition). Indeed, the patient's situation was so hopeless that her family opted for non-cancer-related palliative care with the inevitable consequence that the patient's overall condition would (and did) worsen. Thus, even if there were departures from the standard of care, plaintiff's expert failed to separate the effects attributable to the patient's comorbidities and the effects, if any, attributable to any negligence or medical malpractice. Between the patient's "exocrine"[8] pancreatic insufficiency (impairing her ability to digest and absorb nutrients, leading, in turn, to malnutrition and hypoalbuminemia), her multifactorial anemia necessitating intermittent transfusions (reducing oxygen delivery to her tissues), her diabetes mellitus (impairing her skin function and predisposing her to the development and persistence of PUs), her diffuse atherosclerosis (further impairing blood flow), and her chronically bedfast state, plaintiff's expert failed to explain how any medical intervention would have bettered the outcome of the actively dying patient.

Defendants' duty to the patient was to provide her with "reasonable care," rather than "doing everything" at any cost, in all situations, and in a manner that would be inconsistent with the overall goals of care. Plaintiff's expert failed to recognize and respect the realities and limitations of the patient's dire condition and her impending death approximately seven months after her initial cancer diagnosis. Instead of facing reality, plaintiff's expert noted, in the

---

[7] "Plasma cell dyscrasia" is defined as "[a] diverse group of diseases characterized by the proliferation of a single clone of cells producing a monoclonal immunoglobulin or immunoglobulin fragment," including "multiple myeloma." Stedman's Medical Dictionary, Entry No. 272100.

[8] "Exocrine" is defined (in relevant part) as "[d]enoting glandular secretion delivered onto the body surface." Stedman's Medical Dictionary, Entry No. 309720.

10

[* 10]

abstract, the day-to-day variations in the measurements of each of the patient's PUs. Plaintiff's expert's suggestions that any interobserver difference in the measurement was necessarily attributable to the individual measurer's negligence, and that any intraday or inter-day variation was likewise necessarily attributable to systematic bias and institutional negligence, were speculative and unsupported by any facts in the record. In any event, "[a] failure to document each element of the skin care protocol does not equate to a failure to perform each element or to a cause of the ulcer itself." *Braunstein v. Maimonides Med. Ctr.*, 161 A.D.3d 675, 78 N.Y.S.3d 344 (1st Dept. 2018) (*citing Topel v. Long Is. Jewish Med. Ctr.*, 55 N.Y.2d 682, 446 N.Y.S.2d 932 [1981]). Further, any alleged omissions in the turning and positioning schedules and in the wound-care records maintained by defendants could not have (in and of themselves) injured the patient. *See Shapiro v. Gurwin Jewish Geriatric Nursing & Rehabilitation Ctr.*, 84 A.D.3d 1348, 923 N.Y.S.2d 894 (2d Dept. 2011).

Dr. Khaski's Opposition

Dr. Khaski's opposition was not probative on the ultimate issue of proximate cause because it addressed the alleged inconsistencies in the measurements of the patient' PUs.

The Court considered the parties' remaining contentions and found them either moot or unavailing in light of its determination.

## Conclusion

Accordingly, it is

**ORDERED** that the Methodist defendants' motion for summary judgment is granted, and all claims as against them are dismissed with prejudice and without costs and disbursements, and it is further

11

[* 11]

**ORDERED** that Dr. Kuo's motion is granted, and all claims as against her are dismissed with prejudice and without costs or disbursements, and it is further

**ORDERED** that HSH's cross-motion is granted, and all claims as against it for vicarious liability *insofar as predicated on Dr. Kuo's alleged acts and omissions* are dismissed, and it is further

**ORDERED** that the action is severed and continued against remaining appearing defendants Albert Khaski, M.D., Magdi Anis Bebawi, M.D., and Haym Salomon Home for Nursing and Rehabilitation, and it is further

**ORDERED** that to reflect the dismissal of the Methodist defendants and Dr. Kuo from this action, the caption is amended as follows:

-----------------------------------------------------------------X
SOFIYA PETROVA, as Administrator of the Goods, Chattels
and Credits, which were of GENYA KATS, deceased,

Plaintiff,

-against-

ALBERT KHASKI, M.D.,
MAGDI ANIS BEBAWI, M.D., and
HAYM SALOMON HOME FOR NURSING AND REHABILITATION,

Defendants.
-----------------------------------------------------------------X

; and it is further

**ORDERED** that the Methodist defendants' counsel is directed to electronically serve a copy of this Decision and Order with notice of entry on the other parties' respective counsel and to electronically file an affidavit of said service with the Kings County Clerk, and it is further

12

**ORDERED** that the parties are directed to appear remotely at the Alternative Dispute Resolution Conference on March 19, 2025, at 10:00A.M.

This constitutes the Decision and Order of the Court.

ENTER,

Genine D. Edwards
J. S. C.

13